# In the United States Court of Federal Claims

## BID PROTEST

<table>
<tr><td>

AGMA SECURITY SERVICE, INC.,

               Plaintiff,

         v.

THE UNITED STATES OF AMERICA,

              Defendant.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

No. 21-1892C<br>(Filed Under Seal: January 31, 2022 |<br>Reissued: March 23, 2022) *

</td></tr>
</table>

*Alan Grayson*, Orlando, FL, for Plaintiff.

*Vincent D. Phillips, Jr.*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were, *Douglas K. Mickle*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Acting Assistant Attorney General. *H. Weston Miller*, U.S. Department of Homeland Security, Washington, DC, Of Counsel.

---

\* This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions. In response, Plaintiff, AGMA Security Service, Inc. ("AGMA"), did not request redactions. The government, however, asked to redact the names of offerors other than AGMA and the awardee, Kerberos International, Inc. ("Kerberos"), to protect "the business proprietary pricing data of these other offerors." The government also requested that the Court redact several details of Kerberos' price proposal that are not publicly available.

The Court may restrict public access to records which contain "business information that might harm a litigant's competitive standing," <u>Nixon v. Warner Commc'ns, Inc.</u>, 435 U.S. 589, 598 (1978). But that authority to shield parts of its Opinion from the public view is subject to the "strong presumption in favor of a common law right of public access to court proceedings." <u>In re Violation of Rule 28(D)</u>, 635 F.3d 1352, 1356 (Fed. Cir. 2011).

In the Court's view, the government's proposed redactions appropriately shield information that could affect an offeror's competitiveness without obscuring for the reader the facts and rationale that underpin the Court's disposition of AGMA's claims. The Court, therefore, reissues its Opinion with some offerors' names and sensitive pricing information redacted.

<u>**OPINION AND ORDER**</u>

**KAPLAN, Chief Judge.**

The plaintiff in this post-award bid protest is AGMA Security Service, Inc. ("AGMA"). It challenges the decision of the Federal Protective Service ("FPS" or "the agency") to award a contract to provide security services at Customs and Border Protection facilities in Puerto Rico to Kerberos International, Inc. ("Kerberos"). AGMA contends that the award decision was arbitrary, capricious, and contrary to law in a number of respects.

Specifically, it claims: (1) that FPS improperly awarded the contract to Kerberos without evaluating AGMA's technical proposal to determine whether it provided better value to the government; (2) that the agency violated provisions of the solicitation governing the calculation of total evaluated price; (3) that it was arbitrary for the agency to conclude that Kerberos' proposal raised no price-realism concerns; (4) that the agency's assignment of the highest adjectival rating to Kerberos' technical proposal for the past performance factor was inconsistent with the record; (5) that FPS should have disqualified Kerberos based on nonresponsibility because it did not possess certain licenses at the time of contract award; and (6) that the agency failed to appreciate a number of legal issues raised by the exclusivity clause contained in the teaming agreement between Kerberos and its partner, the COGAR Group, Ltd. ("COGAR").

Currently before the Court are the parties' cross-motions for judgment on the administrative record. <u>See</u> Pl.'s Mot. for J. on the Admin R. and Mot. for Permanent Inj. ("Pl.'s MJAR"), ECF No. 14; Def.'s Cross-Mot. for J. on the Admin R. and Resp. in Opp'n to Pl.'s Mot. ("Def.'s MJAR"), ECF No. 15. For the reasons set forth below, the Court concludes that AGMA's arguments lack merit. FPS' decision to award the contract to Kerberos was not arbitrary and capricious, an abuse of discretion, or contrary to law. Therefore, AGMA's motion for judgment on the administrative record, ECF No. 14, is **DENIED**, and the government's motion, ECF No. 15, is **GRANTED**.

**BACKGROUND**

**I.      The Solicitation**

FPS issued Solicitation No. 70RFP120RE2000002 ("the Solicitation") on August 25, 2020. Admin. R. ("AR") Tab 5 at 325. The Solicitation invited proposals from entities participating in the Small Business Administration's 8(a) program to provide armed security at Customs and Border Protection facilities in Puerto Rico over a one-year base period and four one-year option periods. <u>Id.</u> at 325–26. The Solicitation contemplated the award of a firm-fixed price, indefinite delivery/indefinite quantity contract, with the acquisition conducted in accordance with the procedures set forth in Federal Acquisition Regulation ("FAR") Part 12. AR Tab 1a at 2; AR Tab 1b at 4; AR Tab 5 at 621. It specified that the five-year period of performance would run from April 1, 2021, to March 31, 2026. AR Tab 5 at 326.

A.     **Contents of Proposals**

1.     **Technical Proposal**

The Solicitation instructed offerors to submit a technical proposal documenting their relevant past performance and management approach. Id. at 623–29. For the past performance component, offerors could submit up to three contracts that they were performing at the time or had performed within the previous three years. Id. at 624. If an offeror's proposal included a teaming arrangement (as the awardee's did in this case), the offeror could also submit up to three of its partner's contracts. Id. at 624–25. The Solicitation explained that FPS would compare the past performance examples with the work requirements in the Solicitation and evaluate their relevance and quality. Id. at 624.

The Solicitation also directed offerors to detail their management approach in their technical proposals. Id. at 626–29. Specifically, the Solicitation instructed offerors to describe their plans for providing onsite supervision of armed security officers and for conducting inspections as part of their quality control efforts. Id. at 626–28. In addition, the Solicitation required offerors to propose transition timelines that outlined the steps they would take to prepare to perform the contract. Id. at 628–29.

2.     **Price Proposals**

In addition to their technical proposals, offerors were also required to submit price proposals. Id. at 629–32. Using a schedule contained in the Solicitation, those proposals were to include prices for each contract line item in the base period and in each of the four option periods. Id. at 629–30. In addition, the Solicitation required offerors to aggregate line-item costs and submit total estimated prices for each work period. Id. at 630.

"To ensure the submission of an adequate price element breakdown," the Solicitation suggested that the contractor complete a "Price Element Breakdown" worksheet. Id. Offerors were advised in the Solicitation that the agency "may use this breakdown to conduct a price realism evaluation for the purpose of measuring the Contractor's understanding of the solicitation requirements and for assessing the performance risk inherent in the Contractor's price." Id. at 631.

B.     **Licensing Requirement**

The Solicitation's statement of work ("SOW") enumerated the requirements for performance under the contract. See generally id. at 385–466 (SOW). Included among those requirements, and relevant to the present protest, are provisions concerning the contractor's obligations: (1) to "obtain required licenses and permits for company and/or contract employees prior to [armed security officers] standing post," id. at 401; (2) to "maintain valid licenses and permits throughout [the] contract period," id.; and (3) to "obtain, possess, and maintain state and/or local requirements . . . prior to commencement of work under this contract," including "[b]usiness and corporate licenses to operate as a commercial security service" and "[l]icenses

and permits for employees to be armed and have the authority to detain person(s) suspected of committing crimes," id. at 402.

### C.      Evaluation Scheme Overview

The agency's source selection plan provided that adjectival ratings would be assigned to both the past performance and management approach components of offerors' technical proposals. See AR Tab 4f at 274–75. The ratings ranged from "Highly Acceptable" on one end, to "Unacceptable" on the other. Id. In addition, the scheme included a "Neutral" rating applicable only to the past performance factor and where an offeror had "[n]o relevant performance record . . . upon which to base a meaningful performance risk prediction." Id. at 275.

The Solicitation described how FPS would evaluate offerors' price proposals. See AR Tab 5 at 629–31. First, FPS would add the aggregate prices for the base period and the four option periods to calculate each offeror's total price. Id. at 629. Then, to account for the possibility that FPS would exercise its "unilateral option" pursuant to FAR 52.217-8 to extend the contract for six months beyond the end of any work period, FPS would add to an offeror's total price "six months of the offeror's final option period price" to arrive at an offeror's total evaluated price. Id.

The Solicitation stated that FPS would award a contract "to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered," and specified that "[t]he technical evaluation factors, when combined, are more important than price." Id. at 621; see also FAR 52.212-2. Likewise, the Solicitation explained that FPS would determine whether an offeror's price, "in combination with the other evaluation factors specified in the solicitation, represents the best value to the Government." AR Tab 5 at 629.

### D.      The Efficient Competition Provision

The evaluation scheme also included a so-called "efficient competition" provision. See id. at 622–23. In that provision, FPS reserved the right in certain circumstances not to evaluate all of the technical proposals it received, stating as follows:

> [T]he Government contemplates the possibility that it may identify an offer(s) of such a high technical quality that it would not be in the Government's interest to pay an additional price premium for any additional technical (non-price) advantage. As a result, offerors are advised that the Government may not evaluate the technical proposals of all offerors under this RFP. The Government will first review the total evaluated price of all proposals received. The technical proposals of those offerors whose pricing is determined by the Contracting Officer to be most competitive may be reviewed prior to, or instead of, other technical proposals received. Based on the initial review of these technical proposals, the Government may not evaluate the technical proposals of other offerors, whose total evaluated pricing was higher than that of one already evaluated and already assigned the highest possible technical

> adjectival rating. This would occur when the Contracting Officer determines that one or more of the technical proposals already reviewed is of such a level of quality that it would not be in the interest of the Government to incur cost beyond the price of the technical proposals already reviewed.

Id.

## II.   Evaluation and Award Decision

### A.   The Determination of the Most Competitive Offers

Ten offerors, including AGMA and the awardee, Kerberos, submitted proposals in response to the Solicitation. AR Tab 28 at 1832–33.[1] The contracting officer ("CO") began by reviewing the total prices of all of the proposals received. Id. at 1834–35. His comparison of the proposals' prices is reflected in the table below:

| Contractor | Total Price | % Difference from Lowest Proposal | % Difference from Proposal Listed Immediately Above |
|---|---|---|---|
| [* * *] | $21,455,420.00 | - | - |
| Kerberos International, Inc. | $21,854,180.00 | 1.86% | 1.86% |
| [* * *] | $21,992,085.00 | 2.50% | 0.63% |
| AGMA Security Services | $23,353,705.00 | 8.85% | 6.19% |
| [* * *] | $23,659,880.00 | 10.27% | 1.31% |
| [* * *] | $23,734,355.00 | 10.62% | 0.31% |
| [* * *] | $23,857,510.00 | 11.20% | 0.52% |
| [* * *] | $24,779,050.00 | 15.49% | 3.86% |
| [* * *] | $84,643,445.00 | 294.51% | 241.59% |

Id. at 1834.

Based on this comparative data, the CO identified "four distinct groups of proposals." Id. at 1835. The first group consisted of the lowest-priced proposal, which belonged to [* * *], and the proposals of two other vendors (one of which was the awardee, Kerberos). See id. at 1834–35. The price proposals of Kerberos and the other vendor fell within approximately 2.50% of [* * *] price proposal. See id. The second group consisted of four vendors whose prices were between approximately 8.85% and 11.20% higher than [* * *] proposal. See id. AGMA's proposal was the lowest priced in this group. See id. The third group included a single vendor whose price was about 15.49% higher than [* * *], and the fourth group similarly consisted of only one vendor, whose price was 294.51% higher than [* * *], the lowest-priced offeror. See id.

---

[1] FPS excluded one offeror from consideration after determining that its proposal did not satisfy the Solicitation's requirements. AR Tab 28 at 1833. The agency therefore evaluated nine offers. See id. at 1834–35.

The CO also calculated the average price of all proposals (excluding the highest-priced proposal). Id. at 1835. That average price was $23,085,773.13. Id. AGMA's price proposal was approximately $267,932 higher than that average. See id. at 1834–35.

### B.  The Evaluation of Kerberos' Technical Proposal

Based on the pricing comparison set forth above, the CO invoked the efficient competition provision and referred only the three lowest-priced proposals ([* * *] and Kerberos) to the technical evaluation team ("TET"). See id. at 1834–35; see also AR Tab 23 at 1438–86. For each technical proposal, the TET evaluated the offeror's relevant past performance and management approach, and it assigned an adjectival rating to each factor. See AR Tab 23 at 1445–74.

The TET assigned "Highly Acceptable" ratings to Kerberos' technical proposal as to both past performance and management approach. Id. at 1474; see also id. at 1453–63 (Kerberos' evaluation).[2] The other two offerors received "Acceptable" ratings for both technical factors. Id. at 1474; see also id. at 1445–53 ([* * *] evaluation), 1463–74 ([* * *] evaluation).[3]

### 1.  Past Performance

Kerberos' "Highly Acceptable" past performance rating was based on the TET's evaluation of both Kerberos' past performance and that of its teaming partner, COGAR. See id. at 1453–60; see also AR Tab 5 at 625 (explaining that offerors may submit additional reference projects to demonstrate the relevant past performance of teaming partners).

---

[2] A "Highly Acceptable" rating is assigned where the "[p]roposal meets and exceeds the requirements for an acceptable rating" and where the proposal demonstrates "a high probability of success in contract performance" based on the following:

> (1) the proposal exceeds the solicitation requirements; (2) the proposal offers innovations and/or creative approaches that are beneficial to the Government; (3) the proposal demonstrates a superior understanding of the solicitation requirements and/or; (4) the level of performance risk associated with the proposal is substantially less than the level expected from a competent Contractor[.]

AR Tab 23 at 1444.

[3] An "Acceptable" rating is appropriate where a "[p]roposal meets all the requirements of the solicitation with no deficiencies or affirmative exceptions to the solicitation requirements." AR Tab 23 at 1444. An "Acceptable" proposal demonstrates that the offeror has "[a] good probability of success in contract performance" as demonstrated by the fact that "(1) the proposal reflects a satisfactory understanding of the solicitation requirements; and (2) the level of performance risk associated with the proposal is no more than the level expected from a competent Contractor." Id.

The TET reviewed references for three contracts for security services that Kerberos was performing at the time it responded to the Solicitation. AR Tab 23 at 1453–56. It determined that the first contract, which was with the Centers for Medicare and Medicaid Services ("CMS") was "fully relevant" to the current procurement "in terms of scope, magnitude[,] and complexity." Id. at 1455. The TET noted that CMS had rated Kerberos' performance on the contract "Acceptable" and said it would hire Kerberos again. Id. The TET determined that both Kerberos' second contract, with the United States Merchant Marine Academy, and a third contract, with TaskUS, were relevant in terms of scope and complexity but not magnitude. Id. at 1455–56. Nonetheless, it characterized the second and third contracts as relevant "in the aggregate," and noted that the respondent to a questionnaire about the third contract rated Kerberos "Highly Acceptable." Id. at 1456, 1459.

The TET also evaluated two contracts for security services that COGAR submitted for consideration as part of Kerberos' technical proposal. See id. at 1456–59.[4] The TET determined that both contracts were fully relevant; indeed, COGAR was the incumbent contractor and one of its reference contracts was for security services at Customs and Border Protection facilities in Puerto Rico. Id. at 1458. For both contracts, the TET reviewed assessments from the Contract Performance Assessment Reporting System ("CPARS"), which rated COGAR's performance on one contract between "Very Good" and "Exceptional" and, on the other contract, between "Satisfactory" and "Very Good." Id.; see also AR Tab 24b at 1554–87, 1610–15 (COGAR's CPARS assessments). The TET noted that COGAR was rated "Exceptional" in all categories in the most recent assessment of COGAR's performance under the incumbent contract. AR Tab 23 at 1458.

The TET reviewed three more CPARS assessments of COGAR. See id. at 1459; see also AR Tab 24b at 1588–92, 1602–09 (COGAR's CPARS assessments). On one of these assessments, COGAR received a rating of "Marginal." AR Tab 23 at 1459; see also AR Tab 24b at 1589–91. The TET explained that the "Marginal" rating followed COGAR's request to cancel a contract early. See AR Tab 23 at 1459. COGAR's bid for that contract had been too low, and COGAR faced financial harm, including bankruptcy, if it continued to perform under the contract. Id. The TET considered the circumstances that led to COGAR's "Marginal" rating, the time that had elapsed since the rating, and COGAR's performance on other metrics. Id. at 1460. It concluded that the "Marginal" rating was "an isolated incident" that did not represent a significant risk of underperformance on the current contract. Id.

### 2. Management Approach

As noted, the TET also assigned a rating of "Highly Acceptable" to the management approach outlined in Kerberos' proposal. Id. at 1463. The TET reviewed Kerberos' plans for supervising employees, conducting inspections of employees and their posts, addressing misconduct, and transitioning to contract performance. See id. at 1460–63. Overall, the TET

---

[4] Kerberos' technical proposal included three of COGAR's contracts. See AR Tab 15a 1129–37. But COGAR performed one of the contracts more than three years earlier. Id. at 1135; see also AR Tab 23 at 1459. Pursuant to the Solicitation, the TET excluded this contract from its evaluation of COGAR's past performance. AR Tab 23 at 1459; see also AR Tab 5 at 624.

identified seven strengths and no weaknesses in Kerberos' proposed management approach. Id. at 1463. It concluded that "the proposal meets and exceeds the requirements," and that "the level of performance risk associated with the proposal is substantially less than the level expected from a competent Contractor." Id.

## C.    The Price-Realism Analysis

The CO conducted price-realism analyses only for Kerberos, whose technical proposal received the highest possible ratings, and [* * *], which, as noted, submitted the lowest-priced proposal. See AR Tab 28 at 1837–42. The CO's analysis of Kerberos' proposal—which was based on the price breakdown provided in its pricing element worksheet—was detailed and comprehensive. See id. at 1835–42; see also AR Tab 15b at 1194–97 (Kerberos' pricing element worksheet). Based on that analysis, he found that Kerberos' proposal presented no price-realism concerns. See AR Tab 28 at 1839–42.

The CO began by examining Kerberos' proposed hourly wage and health and welfare rates. Id. at 1839. Because both rates met the minimum required under the contract, the CO concluded that they did not create price-realism concerns. Id. at 1839–40. Moreover, the CO noted that the wage and health and welfare rates were "the most significant cost elements," [* * *]. Id. at 1839.

Next, the CO reviewed Kerberos' proposed prices for employees' paid breaks during the workday and for holidays, training, and other paid time away from work. Id. at 1840–41. The CO also considered Kerberos' proposal to pay supervisors and Puerto Rico's disability insurance tax. Id. at 1841. The CO did not identify any price-realism concerns among these components of Kerberos' price proposal. Id. at 1840–41.

Kerberos also proposed [* * *] for other direct elements (e.g., uniforms, weapons, guard license fees, and vehicles). Id. at 1841; see also AR Tab 15b at 1194. [* * *] had proposed [* * *] for the same items. AR Tab 28 at 1841; see also AR Tab 18b at 1403 ([* * *] pricing element worksheet). The CO noted, however, that Kerberos' teaming agreement with the incumbent contractor could explain the difference between the proposed prices. AR Tab 28 at 1841–42. The CO explained that, under the previous contract, COGAR already may "have incurred the bulk of costs typically associated with new vendor transition (weapons, uniforms, ammunition, personal protective equipment, security supplies)." Id. at 1842. The CO concluded that Kerberos' pricing for other direct elements did not "significantly increase contract performance risk." Id.

The CO noted that Kerberos' proposed hourly wage rate for the base year ($26.57) was 15.7% less than COGAR's rate under the existing contract ($30.74). Id. But COGAR's current rate, he explained, "was negotiated in a sole source environment," and "it is expected that the hourly rates of the instant requirement would be less as these rates are being proposed in a competitive environment." Id. Likewise, the CO determined that Kerberos' proposed hourly rate for emergency security services was significantly lower than the base rate under the existing contract. Id. He found, however, that the low rate represented "minimal performance risk" because the Solicitation capped the hours for emergency security services at only 1.5% of overall

hours. Id.; see also AR Tab 5 at 325–29 (Solicitation's Standard Form 1449 and pricing schedule).

### D. The Decision Not to Evaluate Other Less Competitively Priced Technical Proposals

Upon reviewing the TET's evaluation of the three lowest-priced proposals, the CO invoked his authority under the efficient competition provision to make an award decision without conducting an evaluation of any other proposals. AR Tab 28 at 1835. The CO noted that the difference in price between the highest-ranked evaluated proposal (Kerberos') and the lowest-priced unevaluated proposal (AGMA's) was 6.99%. Id. He concluded that "any possible technical superiority of an unevaluated (and higher priced) technical proposal, over a (lower priced) proposal that was already evaluated and assigned the highest possible technical rating, would not warrant an additional price premium." Id. He explained that "it would not be in the best interest of the Government to incur costs beyond the price of the technical proposals already evaluated," and that, "[a]s such, no additional proposals were reviewed in accordance with the [Solicitation]." Id.

### E. The Final Award Decision

After reviewing the TET's evaluations of the three lowest-priced technical proposals and analyzing Kerberos' and [* * *] price proposals, the CO recommended that FPS award the contract to Kerberos, whose proposal, he found, "represents the best value to the Government due to its Highly Acceptable technical rating and competitive price." Id. at 1846.

The source selection authority ("SSA") agreed. See AR Tab 27 at 1828. She concurred with the TET's ratings and with the CO's analysis of Kerberos' price proposal. Id. at 1819. The SSA reviewed Kerberos' and [* * *] proposals and, noting that technical factors were more important than price, concluded that Kerberos' offer was "more advantageous to the Government when compared to the offer of [* * *]." Id. at 1827.

## III. Post-Award Debriefing

FPS notified AGMA on November 18, 2020, that it had awarded the contract to Kerberos and that it had not evaluated AGMA's technical proposal. See AR Tab 30 at 2143–44 (Notice to Unsuccessful Offerors). On November 20, 2020, AGMA requested a debriefing, AR Tab 31 at 2159, which was conducted on November 24, 2020, AR Tab 33a at 2175. During the debriefing, FPS explained that AGMA's price was 6.86% higher than Kerberos' and "was not deemed to be most competitive in comparison to the other offerors selected for initial evaluation." Id. FPS also explained that Kerberos' technical proposal received the highest possible adjectival rating. Id. "[T]herefore," FPS advised AGMA, it had concluded that "any unevaluated offeror would not warrant an additional price premium." Id.

## IV.     GAO Protest

On November 30, 2020, AGMA filed a protest with the Government Accountability Office ("GAO"), challenging FPS' decision not to evaluate AGMA's technical proposal. See AR Tab 36 at 2193–99 (AGMA's GAO protest B-419443). AGMA also challenged FPS' decision to award the contract to Kerberos, alleging that Kerberos was ineligible for the contract because it had not satisfied all of the licensing requirements at the time of award, and arguing that Kerberos had impermissibly teamed with COGAR and engaged in "buying-in." Id. at 2200–01.

GAO denied AGMA's protest on February 19, 2021. AR Tab 43 at 3211–17 (GAO Decision). GAO explained that AGMA's argument that FPS erred in awarding a contract without evaluating AGMA's technical proposal was, in GAO's view, a challenge "to the express terms of the [Solicitation]." Id. at 3214. The GAO concluded that this argument was untimely because it was raised after the deadline for responding to the Solicitation. Id. GAO further concluded that FPS' omission of the six-month option period from its initial review of offerors' prices was not prejudicial to AGMA. Id. at 3215–16. Finally, GAO determined that the Solicitation did not require offerors to satisfy all licensing requirements until after the award of the contract, and GAO found no factual support for AGMA's argument that Kerberos' teaming agreement with COGAR was improper. Id. at 3216–17.

## V.     This Action

AGMA initiated its bid protest in this Court on September 22, 2021. See Compl., ECF No. 1. The government filed the administrative record on October 22, 2021. ECF No. 13. AGMA filed its motion for judgment on the administrative record on November 5, 2021. See Pl.'s MJAR. The government filed its cross-motion for judgment on the administrative record and response to AGMA's motion on November 19, 2021. See Def.'s MJAR. AGMA filed its response to the government's cross-motion and its reply in support of its own motion on December 2, 2021. See Pl.'s Reply in Supp. of its Mot. for J. on the Admin. R. and Mot. for Permanent Inj., and Opp'n to Def.'s Mot. for J. on the Admin. R. ("Pl.'s Reply."), ECF No. 18. The government filed its reply on December 9, 2021. See Def.'s Reply in Supp. of its Mot. for J. on the Admin R. ("Def.'s Reply"), ECF No. 19.

On December 17, 2021, the parties presented oral arguments on their cross-motions for judgment on the administrative record.

## DISCUSSION

## I.     Subject-Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491(b)(1). Specifically, the court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States,

691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest under § 1491(b)(1), a plaintiff must be an "interested party," i.e., "an actual or prospective bidder" who possesses a "direct economic interest" in the procurement. CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (quoting Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). "In a post-award bid protest, the relevant inquiry is whether the bidder had a 'substantial chance' of winning the award" but for the error about which it complains. Eskridge & Assocs. v. United States, 955 F.3d 1339, 1345 (Fed. Cir. 2020) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

AGMA has established its standing to sue. Absent the error it alleges the agency committed when it failed to evaluate AGMA's technical proposal, AGMA would have had a substantial chance of competing for and winning the contract award. Similarly, were it not for the other errors AGMA alleges the agency committed—including the allegedly flawed analyses of the price realism and technical quality of Kerberos' proposal—there is a substantial chance that the agency would have evaluated AGMA's proposal and awarded it the contract. That is because neither of the two other lower-priced offerors received more than "Acceptable" ratings on their technical proposals and because AGMA's proposal was the lowest priced among the unevaluated offerors. The Court therefore has jurisdiction over this bid protest.

## II.     Motions for Judgment on the Administrative Record

An agency's procurement decision is reviewed on the basis of the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). When they do, the Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. The Court is charged with determining "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, 404 F.3d at 1356.

## III.    Scope of Review of Procurement Decisions

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that, "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, 404 F.3d at 1351.

"[P]rocurement decisions are subject to a 'highly deferential rational basis review.'" Safeguard Base Operations, LLC v. United States, 989 F.3d 1326, 1343 (Fed. Cir. 2021) (alteration in original) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)). The Court, therefore, will sustain an agency's award decision so long as it "evinc[es] rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Further, the Court cannot substitute its judgment for that of the agency when reasonable minds might disagree. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))).

## IV.    Merits

### A.    AGMA's Claim that the Agency's Decision Not to Evaluate its Technical Proposal was Arbitrary, Capricious, and an Abuse of Discretion

AGMA's first claim is that FPS' decision to award the contract to Kerberos without at least evaluating AGMA's technical proposal was arbitrary, capricious, and an abuse of discretion. Pl.'s MJAR at 16. It so argues because, in its view, there was a "relatively modest difference between AGMA's price and the award price." Id. AGMA contends that, because "the technical evaluation factors are more important than price, the small difference between AGMA's price and the award price is not sufficient to exclude the possibility that any possible technical advantage in AGMA's proposal would warrant a price premium, and therefore provide the best value to the agency." Id. at 16–17 (internal quotation marks omitted).

AGMA's contentions lack merit. As noted above, the Solicitation's efficient competition provision advised offerors that FPS reserved the right not to evaluate the technical proposals of higher-priced offerors when a more competitively priced proposal was "of such a level of quality that it would not be in the interest of the Government to incur cost beyond the price" of that proposal. AR Tab 5 at 623. The CO explained why he decided to exercise that right here, and his decision was consistent with the terms of the Solicitation. See id. at 622–23; AR Tab 28 at 1834–35 (Pre-Award Business Memorandum).

Thus, the CO explained, he first calculated each of the proposals' total evaluated prices. See AR Tab 28 at 1834.[5] As described above, the CO then separated the price proposals into four price groups. Id. at 1835. The first group, which included awardee Kerberos, was composed of the three lowest-priced proposals. See id. at 1834–35. Those proposals were grouped together

---

[5] As discussed below, however, the CO made an error in his calculation of the actual amount of the offerors' total evaluated prices when, contrary to the Solicitation, he did not include the price of the six-month option period. See AR Tab 5 at 622–23, 629; AR Tab 28 at 1834–35. The Court addresses this error in detail below and concludes that it was not prejudicial to AGMA.

because one was the lowest-priced proposal, and the other two were priced within 2.50% of that proposal. Id. at 1835. The second group consisted of vendors whose prices were between 8.85% and 11.20% of the lowest-priced proposal. Id. AGMA's proposal was in that group. See id. at 1834–35. It was 6.19% higher than the first group's highest-priced proposal. See id. It was also priced above the average total proposed price among the proposals. See id.[6]

The CO referred the three proposals included in the first group to the TET "prior to, [and] instead of, other technical proposals received." See AR Tab 5 at 623; AR Tab 23 at 1439; AR Tab 28 at 1835. AGMA contends that it was an error not to also refer its proposal to the TET because the difference between its price and that of Kerberos, the contract awardee, was "relatively modest." Pl.'s MJAR at 16. It also argues that the CO's decision to create groupings of offerors by price when determining the most competitively priced proposals was "tantamount to an unstated evaluation criterion." Id. at 18 n.20.

These arguments lack merit. The decision where to draw the line as to which proposals have the most competitive prices is one that is committed to the discretion of the agency. Here, the agency drew the line between the first group and the second group on the basis of the approximately $1.4 million (7%) jump in price between the highest-priced proposal in the first group and the lowest-priced proposal in the second group. See AR Tab 28 at 1834–35. Because that line is neither arbitrary nor clearly unreasonable, the Court must defer to the agency's judgment.

Further, sorting the price proposals into groups did not involve the impermissible use of an unstated evaluation criterion. To be sure, an agency is required to evaluate proposals based only on the criteria stated in a solicitation. Summit Techs., LLC v. United States, 151 Fed. Cl. 171, 180–81 (2020) (citing Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)). But "a solicitation need not identify criteria intrinsic to the stated evaluation factors," and, moreover, "agencies retain great discretion in determining the scope of a given evaluation factor." Id. at 180 (quoting PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 536 (2010)). Therefore, to prevail on an argument that the agency impermissibly employed an unstated evaluation criterion, a protester must show that the agency "used a significantly different basis in evaluating the proposals than was disclosed." Wellpoint Military Care Corp. v. United States, 144 Fed. Cl. 392, 404 (2019) (citing Academy Facilities Mgmt. v. United States, 87 Fed. Cl. 441, 470 (2009)), aff'd, 953 F.3d 1373 (Fed. Cir. 2020).

AGMA cannot make that showing here. As explained above, the Solicitation contemplated that the agency would identify which proposals were the most competitively priced. See AR Tab 5 at 622–23. Sorting the proposals into categories by price was the methodology the agency chose to draw that line. See AR Tab 28 at 1834–35. It did not introduce into the procurement a "significantly different basis" for evaluating price. See Wellpoint, 144 Fed. Cl. at 404. Indeed, AGMA makes no effort to explain what it would have done differently

---

[6] The CO did not include the highest-priced proposal when calculating the average because— given that its price was so much higher than the next lowest-priced proposal—it would have distorted the average. AR Tab 28 at 1835.

had it known that the agency intended to group proposals into price categories as a means of identifying which were most competitively priced.

Having reasonably determined which proposals were the most competitively priced, the Solicitation—as noted—gave the CO the discretion to determine whether any of them were "of such a high technical quality that it would not be in the Government's interest" to consider higher-priced proposals. See AR Tab 5 at 622–23. The CO's determination as to that point was also consistent with the Solicitation, rationally based, and adequately documented. See AR Tab 28 at 1835.

The CO noted that the price of Kerberos' proposal was 6.99% lower than the closest higher-priced and unevaluated proposal (AGMA's). Id. at 1834–35. The CO considered that material difference in price along with the fact that Kerberos' technical proposal had received the highest possible rating. Id. at 1835. In the context of a procurement for security guard services that are available in the commercial market, it was reasonable for him to determine that there could be no technical advantage in AGMA's proposal that would persuade the agency to pay a 6.99% price premium. See id.

AGMA also argues that, without reviewing its technical proposal, the agency could not have decided whether any of the proposal's possible benefits merited its additional cost, nor could the agency provide the rationale for its trade-off decision as required by FAR 15.101-1 and 15.308. Pl.'s MJAR at 17–18. Of course, this is not a FAR Part 15 procurement. See AR Tab 5 at 621 (explaining that the agency "will conduct this acquisition using the procedures of [FAR] Part 12"). But more importantly, at its core, this argument is one that challenges the lawfulness of the efficient competition provision itself. See Pl.'s MJAR at 20–21. That provision expressly contemplates that the agency may identify a highly rated proposal among those most competitively priced and then—without conducting a technical evaluation of any of the higher-priced proposals—find that "it would not be in the Government's interest to pay an additional price premium for any additional technical (non-price) advantage." AR Tab 5 at 622 (emphasis supplied).

AGMA did not object to the efficient competition provision before the deadline for responding to the Solicitation. See AR Tab 5 at 325; AR Tab 36 at 2193. That is, it did not argue before the deadline that the agency could not determine that it was not in the government's interest to pay an offeror's higher price without evaluating the offeror's technical proposal. Therefore, the Court agrees with GAO that AGMA has waived this challenge to the agency's use of the efficient competition provision. See AR Tab 43 at 3214; Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

### B.      AGMA's Challenge to the Agency's Failure to Include the Six-Month Option Period in its Calculation of Total Evaluated Price

As explained above, under the Solicitation, the decision as to which proposals were most competitively priced was to be based on a comparison of each proposal's total evaluated price (i.e., the proposal's price for the base period, four one-year option periods, and the six-month option period authorized by FAR 52.217-8). See AR Tab 5 at 622–23, 629. As AGMA observes,

however, FPS did not include the price of the six-month option period when it calculated the prices it used to determine which proposals were most competitively priced. Pl.'s MJAR at 21–22; see also AR Tab 5 at 622–23, 629; AR Tab 28 at 1834–36. The CO also used the flawed price amounts when he decided not to evaluate AGMA's proposal after the TET assigned "Highly Acceptable" ratings to Kerberos' technical proposal. See AR Tab 28 at 1835.

It is undisputed that the exclusion of the six-month option period was inconsistent with the Solicitation's requirements. See Pl.'s MJAR at 21–22; Def.'s MJAR at 16–17. Nonetheless, to secure relief based on this error, the protester must establish that it was a prejudicial one. See Sys. Stud. & Simulation, Inc. v. United States, No. 2021-1469, 2021 WL 6140242, at *2 (Fed. Cir. Dec. 30, 2021). Specifically, it "must show that there was a substantial chance it would have received the contract award but for [the error]." Glenn Def. Marine (Asia), PTE Ltd. v. United States, 720 F.3d 901, 912 (Fed. Cir. 2013); see also Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (explaining that, to establish competitive prejudice, a protester must demonstrate "that it was within the zone of active consideration" (quoting CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983))).

In this case, AGMA has not persuaded the Court that—had the six-month option period been included in the calculation of total evaluated price—its proposal would likely have been found among the most competitively priced and therefore at least been evaluated. Instead, it notes that considering the option period "would have affected the evaluated price of both" its proposal and of Kerberos' proposal. Pl.'s MJAR at 22. And it posits that the effect, in turn, "could have led to a different determination" whether to evaluate AGMA's technical proposal and award it the contract. Id.; see also Pl.'s Reply at 9–10, n.8 (stating that "[t]he issue is whether the agency might have evaluated AGMA's technical proposal if it had used the correct formula").

But AGMA's burden of proving prejudicial error requires more than showing that an error "could have led to a different determination." See Pl.'s MJAR at 22; Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[A] showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice."). The protester must show that but for the error it would have had a substantial chance of being awarded the contract. Glenn Def. Marine, 720 F.3d at 912. AGMA, as noted, fails to make that showing.

AGMA alleges further that the percentage difference between its price and Kerberos' price "was less during the last six-month option period than it was during [the preceding performance periods]" and that, had the agency considered this narrower price differential, AGMA stood a substantial chance of receiving the contract. Pl.'s MJAR at 23. But the Court's own analysis suggests that—had the six-month period been included—it would have reduced the percentage difference between Kerberos' price proposal and AGMA's by only a very small amount, leaving more than a 6% gap between the offerors' prices. See also Def.'s MJAR at 18–19 (contending that using the six-month option period would have "resulted in a price difference that was only []0.20 percent less than what was originally evaluated"). There is no reason to believe that this minor reduction in the price differential would have caused the agency to find

AGMA's proposal among the most competitively priced, or caused it not to award the contract to Kerberos without evaluating higher-priced technical proposals.

In sum, AGMA has not convinced the Court that the CO's failure to include the six-month option period when determining and comparing the offerors' total evaluated prices was prejudicial to its interests. The Court therefore finds this protest ground unavailing.

### C.    AGMA's Claim that the Agency's Price-Realism Analysis of Kerberos' Proposal was Flawed

AGMA claims that its protest should be sustained because the agency's price-realism analysis of Kerberos' proposal ignored information showing, among other things, that Kerberos was bidding both below the incumbent contract price and below its own costs. Pl.'s MJAR at 25–28. Indeed, AGMA argues, the agency should have recognized that Kerberos was engaging in the disfavored practice of "buying-in" when it submitted what AGMA characterizes as a "low-ball" price proposal. Id. at 25–26. AGMA's arguments lack merit.

The term "price realism" does not appear in the FAR. FAR 15.404-1(d)(3), however, references "cost realism analyses," which agencies may use in competitive fixed-price contracts like the present one.[7] The purpose of such analyses, as the Solicitation itself recognizes, AR Tab 5 at 631, is to determine whether an offeror's price is so low that it reflects a lack of understanding of the solicitation's requirements, thus increasing the risk of poor performance. See KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 356 (2015); CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 378–79 (2010).

An agency has discretion to determine "the nature and extent of a price realism analysis . . . unless the agency commits itself to a particular methodology in a solicitation." KWR Constr., 124 Fed. Cl. at 357 (quoting Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 358 (2009)). Here, the Solicitation did not prescribe a methodology for performing the price-realism analysis. See AR Tab 5 at 630–31. FPS therefore had "broad discretion" to determine how it conducted its analysis. Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 545–46 (2013) (quoting Ne. Mil. Sales, Inc. v. United States, 100 Fed. Cl. 103, 118 (2011)). And the Court's scope of review is a limited one. See Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009). Its job is to ensure that the agency "took into account the information available," and that it indulged no "irrational assumptions" and made no "critical miscalculations." Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. 523, 539 (2011); see also Afghan Am. Army Servs., 90 Fed. Cl. at 358 ("An agency's price-realism analysis lacks a rational basis if the contracting agency made 'irrational assumptions or critical miscalculations.'" (quoting OMV Med., Inc. v. United States, 219 F.3d 1337, 1344 (Fed. Cir. 2000))).

---

[7] The FAR states that such analyses may be appropriate "when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors' proposed costs have resulted in quality or service shortfalls." FAR 15.404-1(d)(3).

The agency's price-realism analysis in this case withstands scrutiny under this standard of review. In fact, AGMA acknowledges that the agency performed what was "admittedly, a very detailed and comprehensive price realism analysis." Pl.'s MJAR at 12. AGMA's various critiques of the agency's approach, see id. at 25–28, do not persuade the Court that the agency's ultimate decision—finding no price-realism concerns—lacked a rational basis, see AR Tab 28 at 1839–42.

First, the agency reasonably found no price-realism concerns arising out of the fact that Kerberos' proposed prices were lower than the price of the incumbent contract. See id. at 1842. The CO explicitly acknowledged that the hourly rate for regular security services under Kerberos' proposal was about 15% lower than the hourly rate under the incumbent contract. Id. But he explained that the difference was likely a product of the competitive environment in which the current procurement was conducted. Id. He noted that the higher hourly rate for regular security services under the incumbent contract, by contrast, was negotiated as part of a one-year, sole-source bridge contract. Id.[8]

Indeed, AGMA "acknowledges that the circumstances under which the two contracts were negotiated [were] different." Pl.'s Reply at 11 n.9. But it faults the CO for not undertaking further analysis to determine whether the differing circumstances accounted for "the full 16% plunge in contract pricing." Id.

As noted above, agencies have broad discretion to determine the scope and depth of their price-realism analyses. See CRAssociates, 95 Fed. Cl. at 379 (observing that "[t]he depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and [this court] will not disturb such an analysis unless it lacks a reasonable basis" (alterations in original) (quoting Biospherics, Inc. v. United States, 48 Fed. Cl. 1, 10 (2000))); see also Fulcra Worldwide, 97 Fed. Cl. at 539 (explaining that a price-realism analysis is not unreasonable simply because it is not conducted with "impeccable vigor" (quoting Halter Marine, Inc. v. United States, 56 Fed. Cl. 144, 172 (2003))). AGMA's demand that the CO quantify the precise amount of the price differential that was caused by the differing circumstances (as opposed to some other factor) is excessive and unreasonable given the breadth of the agency's discretion in this arena. That is especially true given the CO's conclusion that any risk presented by the price differential was "mitigated by the . . . detailed price realism analysis of Kerberos' proposal in which it was noted that there were no price realism concerns." AR Tab 28 at 1843.

There is also no merit to AGMA's argument that the agency should have known Kerberos' price was unrealistic because its pricing element worksheet listed no costs in the "Overhead" column, which AGMA views as evidence that Kerberos bid below its costs. Pl.'s

_____

[8] The Court notes that most of the offerors' hourly rates for regular security services in the base year were less than the rate under the incumbent contract. See AR Tab 9a at 737 (AGMA's price proposal); AR Tab 10b at 797 ([* * *] price proposal); AR Tab 11b at 863 ([* * *] price proposal); AR Tab 12b at 923 ([* * *] price proposal); AR Tab 14b at 1006 ([* * *] price proposal); AR Tab 15b at 1170 (Kerberos' price proposal); AR Tab 16b at 1221 ([* * *] price proposal); AR Tab 17b at 1276 ([* * *] price proposal); AR Tab 18b at 1397 ([* * *] price proposal).

MJAR at 26–27; see AR Tab 15b at 1194 (Kerberos' pricing element worksheet); AR Tab 28 at 1838. But it was not irrational for the agency not to ascribe much significance to the blank space Kerberos left in the "Overhead" column. The Solicitation provided the pricing element worksheet to offerors as a tool to help them determine the rates proposed in the Standard Form 1449 and pricing schedule. AR Tab 5 at 610; see also id. at 325–29. As the government notes, for whatever reason, half of the offerors left the "Overhead" columns on their pricing element worksheets blank. Def.'s MJAR at 26; see also AR Tab 10b at 817; AR Tab 11b at 869; AR Tab 14b at 1101; AR Tab 18b at 1402.

Further, the instructions for the worksheets encouraged offerors not to reflect in the "Overhead" column expenses that they might otherwise have thought to include there. See AR Tab 5 at 606. For example, it directed them to list separately their costs for fringe benefits, non-productive time, and other direct elements, "even if it is the contractor's accounting practice to include these items in their Overhead and/or [general and administrative] rate." Id. In short, under the circumstances, the Court cannot say that the agency committed a critical miscalculation when it ascribed no significance to the absence of costs in the "Overhead" column of Kerberos' worksheet.

AGMA also claims that the agency unreasonably failed to appreciate that Kerberos was attempting to "buy-in" to the procurement. See Pl.'s MJAR at 25–28. In other words, AGMA argues, Kerberos "submitt[ed] an offer below anticipated costs" because it expected to either "[i]ncrease the contract amount after award (e.g., through unnecessary or excessively priced change orders)" or "[r]eceive follow-on contracts at artificially high prices to recover losses incurred on the buy-in contract." Id. at 26 (citing FAR 3.501-1).

AGMA's support for its buying-in argument is largely derivative of the contentions it made in challenging the agency's price-realism analysis and is equally unpersuasive. See id. at 25–28. Moreover, "[a]ttempting to buy into a contract is not illegal." Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 753 (2008); see also id. at 754 ("[T]he FAR does not prevent offerors from buying into a contract."). An agency's responsibilities for addressing buying-in "are forward-looking." Id. at 754; see also FAR 3.501-2 (explaining that agencies "must take appropriate action to ensure buying-in losses are not recovered by the contractor through the pricing of—(1) Change orders; or (2) Follow-on contracts subject to cost analysis").

AGMA also argues that the agency overlooked evidence that Kerberos' teaming partner, COGAR, engaged in the practice of buying-in on an earlier contract, which resulted in its termination. Pl.'s MJAR at 27; see also Pl.'s Reply at 11, 14. But COGAR's conduct on a previous procurement is not attributable to Kerberos, and, as the agency noted in its evaluation of COGAR's past performance, the episode in question was an isolated one and arose out of the failure of one of COGAR's subcontractors to understand performance requirements. See AR Tab 23 at 1459–60.[9]

---

[9] AGMA notes that Kerberos did in fact request an upward adjustment in its contract rate on July 20, 2021, approximately three months into the contract's base period. AR Tab 45e at 3438. The agency granted the request on September 20, 2021, when it issued Modification No. P00006, which increased the cost of the contract by $268,950 over the base period and four option

Finally, in its opening brief, AGMA asserts in a footnote that the agency failed to notice that Kerberos' pricing element worksheet "wrongly credit[ed] the . . . Christmas bonus [that is required by Puerto Rico law] toward health and welfare payments." Pl.'s MJAR at 26 n.30. As AGMA explains further (albeit only in its Reply), under federal law, the United States Department of Labor sets minimum requirements for health and welfare payments in service contracts like the present one. See Pl.'s Reply at 12; see also 41 U.S.C. §§ 6702–03; 29 C.F.R. §§ 4.170, 4.175. At the same time, AGMA explains, Puerto Rico law "requires employers to pay a Christmas bonus . . . up to $600." Pl.'s Reply at 12; see also AR Tab 28 at 1840. "Because the Christmas bonus is legally required in Puerto Rico," AGMA contends, "and because it is not a voluntary health insurance, paid vacation or sick leave, or pension payment, it cannot be credited toward meeting the employer's health, welfare and pension payments required by 29 C.F.R. § 4.175." Pl.'s Reply at 12.

The premise of AGMA's argument, however, appears to be a faulty one. Kerberos' pricing element worksheet does not reflect that Kerberos credited the Christmas bonus to health and welfare payments. See AR Tab 15b at 1194. To the contrary, its pricing element worksheet included a line for health and welfare payments totaling $3,250,243.45 over the base period and four option periods and a separate line entitled "PR Required Christmas Bonus," which totaled $236,825.33 over the same period. Id. Kerberos' pricing narrative expressly states that its price proposal contained a $600 Christmas bonus for full-time employees, and lesser amounts for part-time employees, for the required bonus payments. Id. at 1180.

### D.    AGMA's Claim that the Agency's Evaluation of Kerberos' Technical Proposal was Arbitrary

AGMA challenges the agency's decision to assign a "Highly Acceptable" rating to Kerberos' technical proposal under the past performance factor. See Pl.'s MJAR at 28–31; see also AR Tab 23 at 1453–60. It observes that the agency found that three of the six past performance examples Kerberos and COGAR supplied were not relevant and that, of the three relevant performance examples, two had been rated "Acceptable" (rather than "Highly Acceptable"). See Pl.'s MJAR at 30; AR Tab 23 at 1453–60. It also claims that Kerberos' technical evaluation is "replete with negative comments." Pl.'s MJAR at 28. And while AGMA acknowledges that COGAR had received "Very Good" and "Exceptional" ratings for its performance on the incumbent contract, it points out that the agency also had before it information about another contract that was terminated because COGAR was unable to perform at the contract price. Pl.'s MJAR at 29; see also AR Tab 23 at 1458–60.

---

periods. Id. at 3438–39. AGMA appears to be arguing that this minor adjustment provides proof that Kerberos' proposed price reflected an effort to buy into the contract. See Pl.'s MJAR at 28. But the language of the modification suggests the upward price adjustment was occasioned by a reduction in the amount of security services the agency required, AR Tab 45e at 3439, which the government ascribes to the effects of the COVID-19 pandemic, see Def.'s MJAR at 26–27. AGMA has not supplied the Court with any evidence that the change order was unnecessary or excessively priced, which are the risks identified where an offeror buys into a contract. See FAR 3.501-1.

It is axiomatic that protests concerning "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996). It is also well established that courts afford "substantial deference" to contracting agencies' past performance assessments. CW Gov't Travel, Inc. v. United States, 154 Fed. Cl. 721, 748 (2021); see also Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 785 (2011) (stating that it is a "'well-recognized' principle that 'an agency's evaluation of past performance is entitled to great deference'" (quoting Al Andalus Gen. Contracts Co. v. United States, 86 Fed. Cl. 252, 264 (2009))); RX Joint Venture, LLC v. United States, 145 Fed. Cl. 207, 213 (2019) ("[I]t is well established that evaluations of proposals for their technical quality involves the specialized expertise of an agency's subject-matter experts.").

With those standards in mind, the Court can find no basis to set aside the "Highly Acceptable" rating the agency assigned to Kerberos' past performance. See AR Tab 23 at 1459–60. As described in greater detail above, the TET reviewed Kerberos' past performance on three contracts for security services. Id. at 1453–56. The TET determined that the first contract was relevant in terms of scope, complexity, and magnitude. Id. at 1455. And, with respect to that contract, all of the comments in the past performance questionnaire were positive. Id. Further, while the contracting agency that had responded to the questionnaire assigned an "Acceptable," rather than "Highly Acceptable," rating to Kerberos' overall performance, the TET found that the lower rating did not reflect adversely on the quality of Kerberos' performance but rather was "due to the fact that only [ten] months of performance ha[d] been provided under th[e] contract." Id.

AGMA's assertion that Kerberos' other two contracts were "irrelevant," see Pl.'s MJAR at 30, is incorrect. The TET concluded that both contracts were at least partially relevant because the scope and complexity of those contracts—although not their magnitude—resembled the Solicitation's requirements. See AR Tab 23 at 1455–56. Additionally, because Kerberos was performing both contracts at the time of the TET's evaluation, the TET found that, "when considered in the aggregate," the magnitude of the contracts made them relevant. Id. at 1453, 1459; see also AR Tab 27 at 1820. The TET's determination was in accord with the Solicitation, which provided that the agency "reserves the right to evaluate submitted projects individually or in the aggregate in order to determine relevance." See AR Tab 5 at 624.

The TET assigned a "Neutral" rating to one of these two contracts because the TET did not receive a past performance questionnaire or other performance assessment concerning the contract. AR Tab 23 at 1455–56, 1459. However, the respondent of a past performance questionnaire regarding the other contract "provided all positive comments" and rated Kerberos' overall performance "Highly Acceptable." Id. at 1456.

The TET also evaluated COGAR's past performance on relevant contracts. See id. at 1456–59. The respondent of a past performance questionnaire for one of COGAR's contracts rated COGAR's overall performance "Acceptable," and other performance ratings for the same contract ranged from "Satisfactory" to "Very Good," "with a majority of the ratings being Very Good." Id. at 1458. The TET noted that "[a]ll assessments [of this contract] contained favorable

comments and no negative performance issues." Id. at 1459. Likewise, performance assessments for another contract "were limited, but the information provided was positive and there were no significant negative performance trends noted." Id. COGAR's performance ratings for a third contract ranged from "Very Good" to "Exceptional," "with the most recent assessment containing Exceptional ratings in all rated categories." Id. at 1458. Moreover, COGAR's "Exceptional" ratings concerned its performance under the incumbent contract, "the most relevant past project available." Id.

To be sure, the TET noted that COGAR had received one "Marginal" rating after it asked to cancel a contract early. Id. at 1459–60. According to the TET, the rating was assigned because COGAR had relied on a subcontractor whose pricing proposal ignored some of the contract's requirements. Id. The subcontractor then withdrew from its agreement with COGAR, and COGAR could not continue to perform under the contract without facing financial harm. Id. The TET determined, however, that this single blemish on COGAR's record was an "isolated incident" that did not create a substantial risk of underperformance. Id. at 1460. As it explained, "COGAR's performance on the contract itself was overall very good, even though it[s] mistake in pricing the contract resulted in cost control issues." Id.

Moreover, COGAR had been providing "nearly identical services" under the incumbent contract and had "demonstrated Very Good to Exceptional performance in most categories" under that contract, "with the most recent assessment containing Exceptional ratings in all rated categories." Id. COGAR had also been praised "for [its] work during multiple devastating hurricanes/earthquakes in Puerto Rico." Id. "This exceptional performance demonstrated by COGAR under the most relevant past performance project," the TET concluded, "mitigates the risk associated with the Marginal rating from 2.5 years ago." Id.; see Vantage Assocs., Inc. v. United States, 59 Fed. Cl. 1, 22 (2003) ("[A]n agency, in evaluating past performance, can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract." (quoting Forestry Surveys & Data v. United States, 44 Fed. Cl. 493, 499 (1999))). Further, it observed, "there have been no noted performance or financial issues on the current [Customs and Border Protection] Puerto Rico contract that has been in place since October 2014." AR Tab 23 at 1460.

AGMA also argues that the agency's responsibility determination was arbitrary because it did not consider COGAR's prior contract that was terminated during the performance period. Pl.'s MJAR at 31. AGMA contends that the agency violated FAR 9.104-3(b) by not factoring this negative past performance example into its responsibility determination. Id.; see also FAR 9.104-3(b) ("Past failure to apply sufficient tenacity and perseverance to perform acceptably is strong evidence of nonresponsiblity.").

But the agency in fact considered COGAR's performance history when making its responsibility determination, although it did so indirectly. See AR Tab 26 at 1798. The agency based its responsibility determination in part on the TET's evaluation of Kerberos' technical proposal, see id., and the TET's evaluation covered COGAR's prior relevant contracts, see AR Tab 23 at 1456–60; see also AR Tab 15a at 1129–37. That is, by citing Kerberos' "Highly Acceptable rating under the Past Performance technical factor" as evidence of responsibility, AR Tab 26 at 1798, the CO necessarily incorporated the TET's determination that COGAR's

"Marginal" rating in the past did not present "a significant performance risk for the instant requirement," AR Tab 23 at 1460.

In sum, the TET's review of Kerberos' and COGAR's relevant past performance was thorough, and its assignment of a "Highly Acceptable" rating was supported by the record. See id. at 1453–60. The Court therefore rejects AGMA's contention that the agency's evaluation of Kerberos' and COGAR's past performance lacked a rational basis.

### E.    AGMA's Claim that Kerberos Lacked Required Licenses

AGMA claims that Kerberos did not satisfy the Solicitation's requirement that contractors possess licenses permitting employees to be armed and to detain suspects "prior to commencement of work under [the] contract." Pl.'s MJAR at 31; see also AR Tab 5 at 402. It argues that the license requirement "took hold on the date of contract award" and that Kerberos' proposal did not reflect that it could meet the requirement as of that time. Pl.'s MJAR at 32. Further, it argues that the possession of required licenses is a "definitive responsibility criterion," which must be satisfied "as a precondition to award." Id. (citations omitted).

AGMA's contentions are inconsistent with the plain language of the Solicitation. As noted, the Solicitation required contractors to obtain licenses to employ armed security officers before work commenced, not at the time of the contract award. AR Tab 5 at 402. Thus, SOW section 4.1.6 states that the "[c]ontractor must obtain required licenses and permits . . . prior to [security officers] standing post." Id. at 401; see also AR Tab 8 at 702 (pre-award Q&A providing that "the successful offeror is required to obtain a Puerto Rico security license prior to the beginning of contract performance in accordance with SOW section 4.1.3 and FAR 52.212-4."). Moreover, nothing in the Solicitation required offerors to submit proof of licensure as a condition of receiving the contract award.

Indeed, the Solicitation called for a transition period of up to 120 days "from the contract award date to the performance start date." AR Tab 5 at 394. During this transition period, the Solicitation stated, contractors would provide regular reports on, among other things, their progress toward obtaining permits and licenses. Id. at 395–96. Thus, the Solicitation clearly contemplated that an offeror would be permitted to pursue the licenses to provide armed security services after the time of contract award but before full performance began.

For similar reasons, AGMA's contention that "[t]he possession of required licenses is a definitive responsibility criterion," and so is "a precondition to award," Pl.'s MJAR at 32 (citations omitted), lacks merit. Because the agency did not require offerors to satisfy the Solicitation's licensing requirement at the time the agency awarded the contract, the requirement was not a definitive responsibility criterion. See Advanced Am. Constr., Inc. v. United States, 111 Fed. Cl. 205, 223 (2013) (explaining that a solicitation's requirements "cannot be viewed as responsibility requirements . . . because they are not required to be satisfied by the contractor until after the contract is awarded"); cf. Tidewater Homes Realty, Inc., B-274689, 96-2 CPD ¶ 241 at 2, 4 (Comp. Gen. Dec. 26, 1996) (finding that a licensing requirement was a definitive responsibility criterion where the solicitation stated expressly that an offeror "must supply with

22

its Technical Proposal evidence of its Virginia Real Estate Broker License . . . to be determined responsible and eligible for award").

The GAO decisions that AGMA cites in support of its argument that licensing requirements are treated as responsibility criteria are inapposite. See Pl.'s MJAR at 33 n.37; Pl's Reply at 21–22. If anything, the cases illustrate the difference between particularized and expressly stated responsibility criteria that offerors must satisfy when they submit their proposals and, as in this case, requirements that may be satisfied after an agency makes its award. See, e.g., The Mary Kathleen Collins Trust, B-261019.2, 96-1 CPD ¶ 164 at 1 (Comp. Gen. Sept. 29, 1995) (finding that, where a solicitation provided "that offerors must submit with their initial offers a '[c]ertification in writing from local zoning board that property being offered is currently zoned to permit the type of facility being proposed,'" the solicitation stated a definitive responsibility criterion (alteration in original)); Deployable Hosp. Sys., Inc., B-260778, 95-2 CPD ¶ 65 at 5 (Comp. Gen. July 21, 1995) (explaining that, where a solicitation "calls for the prospective contractor to have a designated number of projects in a specific area completed" and requires offerors to include lists of those projects in their submissions, the requirement is a definitive responsibility criterion); Dalma Tech[2] Co., B-411015, 2015 CPD ¶ 135 at 4 (Comp. Gen. Apr. 22, 2015) (determining that a solicitation included a definitive responsibility criterion where it "explicitly required that offerors 'include [a] copy of [an] actual Saudi business license' with their [proposals]" (first and second alterations in original)). The Court therefore finds without merit AGMA's contention that the agency should have found Kerberos not responsible because Kerberos did not establish that it had the required licenses at the time of contract award.

### F.     AGMA's Claim that Kerberos' Teaming Agreement with COGAR was Improper

Finally, AGMA contends that the teaming agreement that Kerberos entered with COGAR "presents multiple questions of procurement law under FAR Part 3." Pl.'s MJAR at 33. Under the teaming agreement, Kerberos would perform 51% of the contract as the prime contractor and COGAR would perform 49% as a subcontractor. AR Tab 15a at 1154, 1160.

The first issue of law, according to AGMA, "is if the agency properly judged whether Kerberos could truthfully certify to 'independent price determination' under FAR 3.103 & 52.203-2." Pl.'s MJAR at 33–34. Specifically, AGMA argues, paragraph 20 of the teaming agreement collides with the commitment an offeror is required to make not "to induce any other concern . . . to submit or not to submit an offer for the purpose of restricting competition." Id. at 34 (quoting FAR 52.203-2(a)(3)). Paragraph 20, entitled "Exclusivity," states in pertinent part that the parties agree not to compete for the contract or respond to the Solicitation "independently or in conjunction with any other party." AR Tab 15a at 1158.

AGMA's argument lacks merit. To begin with, this acquisition was conducted using the procedures of FAR Part 12. See AR Tab 5 at 621. FAR Part 12 supplants "prescriptions contained elsewhere in the FAR" and sets out the clauses and provisions agencies must use when acquiring commercial services and products. FAR 12.301(d). Those clauses and provisions do not require offerors to execute Certificates of Independent Price Determination. See id.

In any event, there is no basis in this record to find that Kerberos induced COGAR to enter the teaming agreement "for the purpose of restricting competition." FAR 52.203-2(a)(3). At the time the procurement was announced, COGAR had graduated from the Small Business Administration's 8(a) program. See AR Tab 15a at 1118. It was therefore not eligible to compete for the contract irrespective of commitments it did or did not make in the teaming agreement. See AR Tab 5 at 325; see also Def.'s MJAR at 34–35.

The Court also finds no basis for AGMA's assertion that the teaming agreement was, "on its face," inconsistent with FAR 52.203-6(a), which, AGMA observes, prohibits any agreement that "has or may have the effect of restricting sales by . . . subcontractors directly to the Government of any item or process (including computer software) made or furnished by the subcontractor under this contract [or under any follow-on production contract]." Pl.'s MJAR at 36 (quoting FAR 52.203-6(a)). For one thing, the version of that provision that AGMA cites is not applicable to this commercial services procurement. Instead, FAR 3.503-2 states that commercial services contracts should incorporate an alternative version of the provision, which prohibits "any agreement restricting sales by subcontractors [that] results in the Federal Government being treated differently from any other prospective purchaser." See FAR 3.503-2 and 52.203-6; see also AR Tab 5 at 351. And AGMA fails to explain how either provision is even implicated by the teaming agreement.[10]

Finally, the Court rejects AGMA's contention that the teaming agreement Kerberos and COGAR entered, and which the Solicitation expressly contemplated, suggests violations of the antitrust laws, which the agency had a duty to report. See Pl.'s MJAR at 36–38; Pl.'s Reply at 27. The law to which AGMA refers requires agencies to report "evidence of suspected antitrust violations." FAR 3.301(b) (emphasis supplied); see also 41 U.S.C. § 3707 (explaining that agencies must report to the United States Department of Justice ("DOJ") proposals that "evidence[] a violation of the antitrust laws"). The only evidence of an antitrust violation AGMA has identified concerns its claims related to the Certificate of Independent Price Determination and the "Exclusivity" clause in Kerberos' and COGAR's teaming agreement, and the Court has found that those claims lack merit. See Pl.'s MJAR at 36–38; Pl.'s Reply at 27. Thus, there was no obligation on the agency's part to make a report to DOJ much less to disqualify Kerberos' proposal based on suspected antitrust violations.[11]

---

[10] In fact, the teaming agreement specifically states that it "does not limit or restrict the rights of the Parties in offering to sell or selling to others their standard products and services incidental thereto." AR Tab 15a at 1158. It also contains a severability clause that states that if any term of the teaming agreement "is held or finally determined to be void, invalid, illegal, or unenforceable in any respect, in whole or in part, such term, condition or provision shall be severed from this Agreement," leaving the remaining terms in effect. Id. at 1159. Consequently, if any part of the teaming agreement violated FAR 52.203-6, it would be severed from the agreement.

[11] AGMA quotes, without explaining, FAR 3.303, which lists circumstances "that may evidence violations of the antitrust laws." Pl.'s MJAR at 37; see also FAR 3.303(c). Among these circumstances is "[t]he filing of a joint bid by two or more competitors when at least one of the competitors has sufficient technical capability and productive capacity for contract performance." FAR 3.303(c)(7). As discussed above, however, COGAR and Kerberos could not have been competitors in this case because COGAR was ineligible to respond directly to the

**CONCLUSION**

For the foregoing reasons, AGMA's motion for judgment on the administrative record, ECF No. 14, is **DENIED**. The government's cross-motion for judgment on the administrative record, ECF No. 15, is **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge

---

Solicitation. See AR Tab 15a at 1118. Furthermore, Kerberos and COGAR stated that their partnership "fills voids in each Party's technical and production capabilities." Id. at 1154. The Court finds that FAR 3.303(c)(7) does not encompass Kerberos' and COGAR's teaming agreement.